IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| RONNIE LYNN JOHNSON, | ) | Civil Action No. 3:09-2458–JMC-JRM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This case is before the Court pursuant to Local Rules 83.VII.02-.08 DSC, concerning the

disposition of Social Security cases in this District. Plaintiff brought this action pursuant to 42

U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security

(the "Commissioner") denying his claim for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

Plaintiff protectively applied for DIB on April 4, 2005, with an alleged onset of disability

("AOD") of November 12, 2003. Plaintiff's application was denied initially and on reconsideration,

and he requested a hearing before an administrative law judge (the "ALJ").

Plaintiff appeared and testified at a hearing held on July 12, 2007, at which a vocational

expert (VE), also appeared and testified. On April 12, 2008, the ALJ issued a decision finding

Plaintiff was not disabled because, based on Plaintiff's residual functional capacity, his vocational

factors, and the testimony of the VE, he can make an adjustment to other work. See 20 C.F.R.

§ 404.1520(g)(1).

Plaintiff was 45 years old at the time of the ALJ's decision. He has at least a high school

education with past relevant work as an electrician and a maintenance coordinator. (Tr. 27). Plaintiff

alleged disability due to a left shoulder injury; spinal disorders; and chronic depression and anxiety. (See Tr. 22, 114).

The ALJ found (Tr. 19, 22, 27, 28):

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since November 12, 2003, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).

3. The claimant has the following severe combination of impairments: degenerative disc disease (cervical), tendonitis and depression (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find the claimant has the residual functional capacity to perform sedentary exertional work, which is defined as the ability to lift/carry 10 pounds, stand 2 hours in an 8 hour workday, walk 2 hours in an 8 hour workday and sit 6 hours in an 8 hour workday provided he is permitted to sit/stand at will. In addition, the claimant should never climb, crawl, reach overhead with his nondominant arm or be exposed to industrial hazards. He is able to occasionally crouch and stoop. Constant and repetitive neck motion should be avoided. Occasionally, the claimant is able to finger and handle with his nondominant hand and arm. He is able to work in a "low stress" environment, with "low stress" defined as no more than occasional decisionmaking or changes in work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on December 26, 1962, and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from November 12, 2003 through the date of this decision (20 CFR 404.1520(g)).

On July 30, 2009, the Appeals Council denied Plaintiff's request for review (Tr. 3), thereby making the determination of the ALJ the final decision of the Commissioner. Plaintiff then filed this action on September 18, 2009.

## SCOPE OF REVIEW

The Social Security Act (the "Act") provides that DIB shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in the Act as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" twelve months. 42 U.S.C. § 423(d)(1)(A).

In evaluating whether a claimant is entitled to disability benefits, the ALJ must follow the five-step sequential evaluation set forth in the Social Security regulations. See 20 C.F.R. § 404.1520.[1] The ALJ must consider whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to

_____

[1]All of this Court's regulatory references are to the 2008 version of the Code of Federal Regulations (C.F.R.).

her past work, and (5) if not, whether the claimant retains the capacity to perform specific jobs that exist in significant numbers in the national economy. See id.

The scope of judicial review by the federal courts in disability cases is narrowly tailored. Thus, the only issues before this Court are whether correct legal principles were applied and whether the Commissioner's findings of fact are supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). It must do more, however, than merely create a suspicion that the fact to be established exists. Cornett v. Califano, 590 F.2d 91, 93 (4th Cir. 1978).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

<u>**DISCUSSION**</u>

In his brief before the court, Plaintiff alleges that his case should be remanded because: (1) the ALJ failed to evaluate a non-medical source opinion; (2) SSA's subsequent disability award dating from the ALJ's decision indicates that Plaintiff was already disabled; (3) the ALJ erred in his weighting of a treating physician's opinion; and (4) the ALJ failed to find that Plaintiff met Listing 12.04. The Commissioner contends that the ALJ's decision is supported by substantial evidence and free of legal error.

**A. "Other Source" Opinion**

Plaintiff complains that the ALJ failed to address the opinion offered by Dr. Dixon Pearsall, whom Plaintiff's attorney asked "to provide a vocational rehabilitation and employability opinion" on Plaintiff. (Tr. 178). SSA's regulations require that all medical opinions in a case be considered. 20 C.F.R. § 404.1527(b). All "acceptable medical source"[2] opinions, regardless of its giver, are evaluated

> pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005).

<u>Johnson v. Barnhart</u>, 434 F.3d 650, 654 (4th Cir. 2005) (footnote omitted).

Section 404.1527, however, provides rules governing the evaluation of opinions from acceptable medical sources only; there is no corresponding regulation for other opinions. SSA acknowledged that its "regulations include a provision that requires adjudicators to consider any other factors brought to our attention, or of which we are aware, which tend to support or contradict

_____

[2]<u>See</u> 20 C.F.R. § 404.1502.

a medical opinion."  Social Security Ruling (SSR) 06-03p, 71 Fed. Reg. 45,593-03 (Aug. 9, 2006).

It addressed this failing in SSR 06-03p:  "[T]he case record should reflect the consideration of

opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical

sources' who have seen the claimant in their professional capacity."  Id. at 45,596.

    The Ruling goes on to recognize that "an ALJ is not required to discuss all the evidence

submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."

Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).  Thus, SSR 06-03p provides,

> Although there is a distinction between what an adjudicator must consider and what
> the adjudicator must explain in the disability determination or decision, the
> adjudicator generally should explain the weight given to opinions from these 'other
> sources,' or otherwise *ensure that the discussion of the evidence in the determination
> or decision allows a claimant or subsequent reviewer to follow the adjudicator's
> reasoning*, when such opinions may have an effect on the outcome of the case.

71 Fed. Reg. at 45,596 (emphasis added).  This is what the ALJ accomplished in the decision sub

judice.

    Dr. Pearsall, who calls himself a "vocational rehabilitation specialist,"[3] met with Plaintiff on

November 8, 2006.  (See Tr. 178).  His resulting report, dated November 27, 2006, concluded that

Plaintiff was "'not employable.'"  (Tr. 184).  This report, however, is one of many opinions in the

record, as noted by the ALJ.[4]  (See Tr. 26).  Perhaps because of the sheer volume of opinions, the

ALJ addressed only one in depth:  that of Dr. John Roberts, who began treating Plaintiff in December

2003, a month after Plaintiff's AOD, and thereafter saw Plaintiff every 7 to 14 days throughout the

---

[3]There is no indication in the file of what field Dr. Pearsall obtained his doctorate, and there is no curriculum vitae.

[4]To the count of the undersigned, the record contains at least 20 opinions on Plaintiff's level of impairment.

relevant period.[5]  As to the remaining opinions, the ALJ briefly discussed those of the state agency experts, and then added: "In making my decision, these opinions have been carefully considered but, for the reasons stated above, they were not persuasive."  (Tr. 26-27).

Particularly, Plaintiff notes Dr. Pearsall's statement that he "had marked difficulty with recall of dates and sequencing and [Plaintiff] attributed this to pain and medications."  (Pl.'s Br. 26).  As the ALJ noted with regard to Dr. Roberts' opinion, however, this statement is not "'well-supported' by 'medically acceptable' diagnostic techniques, including psychological functional testing."  (Tr. 26 (citing SSR 96-2p, 61 Fed. Reg. 34,490-01, 34,491 (July 2, 1996)).  There is no showing in the report that Dr. Pearsall tested Plaintiff's memory.  Despite Plaintiff's purported difficulties, Dr. Pearsall considered him a "credible personal historian."  (Tr. 178).

Dr. Pearsall further noted that Plaintiff had been diagnosed with and treated for depression and took anti-depressive medications daily.  (Tr. 180).  Plaintiff points to the doctor's statement that, "[v]ocationally, depression limits the capacity to concentrate, focus, follow instructions, maintain pace, and complete tasks.  These are basic expectations of all jobs at all exertion or skill levels, including 'unskilled' jobs."  (Id.).  Dr. Pearsall, however, did not opine that Plaintiff experienced these limitations, or to what extent and, again, there is no indication that he tested Plaintiff.

Plaintiff expresses particular concern that the ALJ's restriction to "work in a 'low stress' environment" would not accommodate his mental limitations – although he fails to describe just how he is limited.  Plaintiff explains that the "basic mental demands of competitive, remunerative,

---

[5]Plaintiff did, however, experience at least 2 substantial periods during which there is no record that he saw *any* caregiver:  3/30/05 - 9/25/05, and 3/31/06 - 2/21/07.  The record, including Dr. Roberts' files, gives no reason for these gaps, which are glaring in light of the frequency of Plaintiff's visits to, and his stated reliance on, Dr. Roberts.  (See Tr. 663).

unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting," and that a "substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base." SSR 85-15, reprinted in West's Social Security Reporting Service: Rulings 1983-1991, at 343, 347 (West Publ'g Co. 1992). But he fails to allege that he is lacking any of these abilities.

At the hearing, Plaintiff asked the VE the effect on the occupational base of "problems with attention and focus and concentration to tasks occasionally during the day." (Tr. 674). The VE answered that a claimant who experienced such difficulty with focus and concentration that they were unable to complete simple "one to two step processes" up to one-third of the workday, would be precluded from all employment. (Tr. 674-75). None of the many opinions included in the record, however, indicate that Plaintiff was impaired to this extent. The records of Dr. Roberts, who saw Plaintiff so often, never observed that Plaintiff experienced problems with focus or concentration. Dr. Roberts did state that Plaintiff's concentration *could* be impaired by the use of narcotics, but only to the extent that he was unable "to function safely in the workplace." (Tr. 257). Notably, the ALJ included a restriction from industrial hazards. (Tr. 22).

Dr. Pearsall reviewed the Functional Capacity Evaluation ("FCE") which Plaintiff underwent in August 2002. (See Tr. 183). According to Dr. Pearsall, the FCE restricted Plaintiff to "light"[6]

---

[6] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If

(continued...)

work with restrictions of no bending, reaching, squatting, kneeling, or crawling. (Tr. 184). It was Dr. Pearsall's opinion that these restrictions would preclude the performance of "unskilled"[7] work at any exertional level. (Id.).

Clearly, however, the ALJ did not adopt these limitations. The ALJ noted that, after this FCE and prior to his discharge, Plaintiff continued to work his regular job, performing tasks in excess of these restrictions. (Tr. 23; see also Tr. 294, 662). Dr. John Steichen, a neurosurgeon, found no significant compression of Plaintiff's neural elements, and "imperfect correlation" between the objective evidence, clinical signs and Plaintiff's alleged symptoms. (Tr. 245; see also Tr. 25). The ALJ thus concluded that there was "little objective evidence" to support Plaintiff's alleged limitations. (Tr. 25). See Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996) (a claimant's allegations about her pain "need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment").

The ALJ also referred to a second FCE, conducted on August 10, 2004, which concluded, despite some "symptom magnification," that Plaintiff could frequently crawl, and occasionally bend,

---

[6](...continued)
someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567(b).

[7] Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.
20 C.F.R. § 404.1568(a).

squat, kneel, and reach above shoulder level. (Tr. 239, 242; <u>see also</u> Tr. 25, 253). Accordingly, the ALJ decided that Plaintiff could occasionally crouch and stoop,[8] although he should never climb nor crawl, and his reaching was unrestricted except for reaching overhead with his nondominant arm. (Tr. 22). When provided with these limitations, among others, the VE at Plaintiff's hearing identified 3 matching jobs which existed in both the national and local economy in significant numbers. (<u>See</u> Tr. 28; 673-74).

Plaintiff further notes Dr. Pearsall's opinion that Plaintiff's "limited cognitive functioning would preclude competitive employment at any exertion or skill level," based on Dr. Roberts' finding that Plaintiff's "GAF"[9] score was 60. (Tr. 184). The American Psychiatric Association defines a 60 GAF as "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 33 (4th ed., text rev. 2000). The ALJ found Plaintiff to experience no more than mild restriction in his activities of daily living and in maintaining social functioning. (Tr. 21). He noted that Plaintiff had continued to work, both at his regular job and in running his own car dealership. Plaintiff maintained his relationships and had even become a Mason, regularly attending meetings.

---

[8]Crouching and stooping are forms of bending. SSR 85-15, <u>West's Social Security Reporting Service: Rulings 1983-1991</u> at 350.

[9]"GAF" – "Global Assessment of Functioning" – ranks psychological, social, and occupational functioning on a hypothetical continuum of mental illness ranging from zero to 100. Am. Psychiatric Ass'n, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32 (4th ed., text rev. 2000) [hereinafter DSM-IV-TR].

Dr. Pearsall's GAF opinion also demonstrates why SSA has explained that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings." "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50,746-01, 50,764-765 (Aug. 21, 2000). In order for a disability claimant to be presumptively found unable to work due to depression, he must meet all of the criteria of "Listing" 12.04, as discussed below; the ALJ found that Plaintiff did not meet this criteria. (Tr. 21).

Plaintiff next points to Dr. Pearsall's conclusion, "to a reasonable degree of professional assurance," that Plaintiff's "medical and exertional restrictions/limitations in conjunction with the vocational effects of depression" rendered Plaintiff "not at present competitively employable at any position represented in significant numbers in the national economy." (Tr. 184). As discussed above, the ALJ rejected the "medical and exertional" restrictions relied upon by the doctor, and Dr. Pearsall failed to support his "vocational effects of depression." Thus, the ALJ's decision that this opinion was "not persuasive" is supported by substantial evidence.

Plaintiff further relies on a second opinion from Dr. Pearsall, which the doctor "updated" in reliance, in part, on Dr. Roberts' records through November 15, 2004. (Tr. 193). As Dr. Pearsall's first opinion is dated November 27, 2006, there is no reason to believe that the reasons provided by the ALJ, as set forth above, would not apply equally to Dr. Pearsall's second opinion to that extent. Dr. Pearsall also reviewed Dr. Roberts' records from February 22 and March 5, 2007; although these visits occurred after an almost 11-month break in treatment, they are not noticeably different from Plaintiff's earlier records. (See Tr. 155, 156).

Dr. Pearsall lastly cited to Dr. Roberts' "Attending Physician Statement" dated June 26, 2007, in which Dr. Roberts opined that Plaintiff was "totally disabled by chronic pain and need for chronic

narcotic medications. Degenerative disc disease worsening & now has facet arthropathy. Chronic neck, shoulder, low back, [left] leg pain. Anxiety and depression." (Tr. 148). However, the ALJ accorded Dr. Roberts' opinion "minimal weight" because of its lack of supportability and consistency (Tr. 26); consequently, there is no reason to think that the ALJ would have afforded Dr. Pearsall's opinion more weight when it was merely second-hand and, at that, based on a minimally-weighted opinion. Further, Dr. Pearsall was not a "treating physician" or even a "medical source," and he had not examined Plaintiff for this second opinion. See generally 20 C.F.R. § 404.1527(d). Accordingly, the undersigned finds no reversible error on this issue.

### B. Date of Onset

Plaintiff contends that, pursuant to a subsequent application dated December 11, 2008, 5 years after his AOD, SSA awarded Plaintiff disability benefits dating from the ALJ's decision. Plaintiff argues that this second decision constitutes "new and material evidence" because it establishes that Plaintiff was disabled as of April 13, 2008.

Plaintiff fails to show that this evidence should be considered by this Court. "Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the [Commissioner]'s decision is supported by substantial evidence." Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (quoting Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972)); see also 42 U.S.C. § 405(g). Thus, the Commissioner's decision should not be reversed based on this evidence because it is not part of the administrative record.

Additionally, Plaintiff fails to show that this action should be remanded to consider such evidence. Additional evidence must meet four prerequisites before a reviewing court may remand

the case to the Commissioner on the basis of newly discovered evidence. These prerequisites are as follows:

(1) the evidence must be *relevant* to the determination of disability at the time the application was first filed and not merely cumulative;

(2) the evidence must be *material* to the extent that the Commissioner's decision might reasonably have been different had the new evidence been presented;

(3) there must be *good cause* for the claimant's failure to submit the evidence; and

(4) the claimant must present to the remanding court at least a *general showing* of the nature of the new evidence.

Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985).[10]

Here, Plaintiff fails to meet the fourth prong of the Borders test, as he has not presented a general showing of the nature of the new evidence; the decision awarding benefits has not been provided to the Court. Additionally, there is no way to tell that the "new evidence" relates to the period leading up to the ALJ's decision. In order to justify remand for reconsideration, a claimant must establish that the evidence was "relevant to the determination of disability at the time the application was first filed and not merely cumulative." Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir. 1983).

_____

[10]The court in Wilkins v. Secretary of Department of Health and Human Services, 925 F.2d 769 (4th Cir. 1991), rev'd on other grounds, 953 F.2d 93 (en banc), suggested that the more stringent Borders four-part inquiry is superseded by the standard in 42 U.S.C. § 405(g). Wilkins, 925 F.2d at 774; see also Wilkins, 953 F.2d at 96 n.3. The statutory standard allows for remand where "there is new evidence which is material and ... there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). However, Borders has not been expressly overruled. Further, the United States Supreme Court has not suggested that the Borders construction of 42 U.S.C. § 405(g) is incorrect. See Sullivan v. Finkelstein, 496 U.S. 617, 626 n.6 (1990).

Further, the undersigned finds persuasive on this issue the reasoning of the Sixth Circuit

Court of Appeals:

> The Supreme Court's interpretation of sentence six of § 405(g) in <u>Melkonyan v. Sullivan</u>, 501 U.S. 89, 111 S. Ct. 2157, 115 L. Ed. 2d 78 (1991), states as follows:
>
>> The district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.
>
> <u>Id.</u> at 98, 111 S. Ct. 2157. Under sentence six, the mere existence of the subsequent decision in Allen's favor, standing alone, cannot be evidence that can change the outcome of his prior proceeding. A subsequent favorable decision may be supported by evidence that is new and material under § 405(g), but the decision is not itself new and material evidence.
>
> If a subsequent favorable decision - separated from any new substantive evidence supporting the decision - could itself be "new evidence" under sentence six, the only way that it might change the outcome of the initial proceeding is by the power of its alternative analysis of the same evidence. But remand under sentence six is not meant to address the "correctness of the administrative determination" made on the evidence already before the initial ALJ. <u>Id.</u> In addition, it is overly broad to read the words "new evidence" in sentence six to include a subsequent decision based on the same evidence. In <u>Melkonyan</u>, the Court noted that the legislative history of § 405(g) shows that "Congress made it unmistakably clear that it intended to limit the power of district courts to order remands for 'new evidence' in Social Security cases." <u>Id.</u> at 100, 111 S. Ct. 2157.
>
> A sentence six remand would be appropriate based on Allen's subsequent favorable decision only if the subsequent decision was supported by new and material evidence that Allen had good cause for not raising in the prior proceeding. It is Allen's burden to make this showing under § 405(g), . . . but he has failed to meet this burden.

<u>Allen v. Comm'r of Soc. Sec.</u>, 561 F.3d 646, 653 (6th Cir. 2009) (footnote omitted).[11]  Plaintiff herein

has also failed to meet his sentence six burden.

### C.  Treating Physician Opinion

Plaintiff argues that the ALJ erred in failing to accord "controlling weight" to Dr. Roberts'

opinion on his functionality.  The ALJ acknowledged how frequently Plaintiff saw Dr. Roberts, his

pain management specialist and psychiatrist, describing Dr. Roberts as "the treating source most

actively involved in [Plaintiff]'s medical care."  (Tr. 23).

Plaintiff apparently returned to work in September 2002 after treatment for an on-the-job

injury.  (<u>See</u> Tr. 207-11).  He claimed that, upon his return, he performed work in excess of his

medically-advised limitations, requiring him to take a narcotic (Vicodin) a few times a week.

(Tr. 151).  He was also running a used car dealership.  (<u>See</u> Tr. 505).  After a period, Plaintiff's

employer subjected him to a random drug test, which revealed the narcotic use.  (<u>See</u> Tr. 211-212).

On or about November 11, 2003, Plaintiff "was told not to come back to work until he was off

narcotic medications because of their side effects."[12]  (Tr. 151, 212).

According to Dr. Roberts, Plaintiff's workers' compensation case manager sent Plaintiff to

Dr. Roberts for pain management and to wean Plaintiff off narcotics.  (Tr. 149, 154).  It was at his

---

[11]As to <u>Reichard v. Barnhart</u>, 285 F. Supp. 2d 728 (S.D. W. Va. 2003), and <u>Luna v. Astrue</u>, No. 07-719-PHX-MHB, 2008 WL 2559400 (D. Ariz. June 23, 2008), upon which Plaintiff relies, the Court remarked, "To the extent that these district court opinions stand for the proposition that the subsequent determination is itself new evidence meriting remand, these opinions misapply § 405(g) for the reasons stated above."  <u>Allen</u>, 561 F.3d at 654.

[12]Thus, Plaintiff did *not* stop working because his impairments prevented performance of substantial gainful activity; he even told Dr. Roberts a month later that he was willing to work full-time in a light duty position.  (Tr. 25; <u>see also</u> Tr. 152).  Rather, Plaintiff stopped working because a medium-exertion job (<u>see</u> Tr. 672) resulted in pain that required a narcotic for pain relief. However, there is no indication that, after this incident, Plaintiff applied for light work.

15

initial visit, on December 8, 2003, that for the first time, a caregiver diagnosed Plaintiff with a mental impairment. Dr. Roberts diagnosed Plaintiff with pain disorder, and explained that Plaintiff's pain would wax and wane according to his emotional fluctuation. (Tr. 153). He further diagnosed Plaintiff with adjustment disorder, and pegged both impairments to Plaintiff's May 2000 on-the-job injury.

At Plaintiff's first visit, Dr. Roberts performed a mental status exam. (Tr. 153). As discussed by the ALJ (Tr. 25), Dr. Roberts found Plaintiff to be alert and oriented, and several other caregivers made similar observations (see, e.g., Tr. 171, 196, 244, 255, 416). Testing revealed that Plaintiff remembered 7 numbers forward and 5 in reverse, and correctly recalled an address after 5 minutes. (Tr. 153). He could multiply 6 x 2 x 2 through to 384. (Tr. 21, 49). His judgment was intact and, as throughout the relevant period, Plaintiff denied suicidal ideation. (Tr. 153). After Plaintiff began taking antidepressants, his mood was mostly stable and euthymic[13] throughout the relevant period. (See Tr. 21).

Plaintiff told Dr. Roberts that he managed his own activities of daily living and would try to work 40 hours per week. The doctor recommended that Plaintiff stop using narcotics. (Tr. 154). The ALJ wrote that, after this initial interview, Dr. Roberts conducted no further testing but only provided counseling and prescriptions. (Tr. 21).

The ALJ additionally noted (Tr. 25) that, although Dr. Roberts believed that there was a psychological component to Plaintiff's pain, Plaintiff often reported relief from injections (see, e.g., Tr. 196, 305, 335, 508, 511, 586). Further, Plaintiff's clinical signs were generally negative, and

---

[13]Relating to, or characterized by, a moderation of mood, neither manic nor depressed. Stedman's Medical Dictionary 627 (27th ed. 2000).

there was some indication of symptom magnification.  (See Tr. 239).  Consistent with Plaintiff's August 2004 FCE, Dr. Timothy Zgleszewski, a chronic pain interventionist, found that Plaintiff had "no restrictions" on sitting, standing, and walking.  (Tr. 253).  As late as March 2007, Plaintiff reported using a weedeater in his yard for 30 minutes, and only on the following day did his pain increase.  (Tr. 107).

The ALJ discussed Dr. Roberts' opinions that Plaintiff was "'moderately impaired psychologically,'" had a GAF of 40,[14] had mental limitations due to chronic pain syndrome and unresolved liability issues (Tr. 25), and had memory and concentration impairments due to pain (Tr. 21).  Based on the above evidence, however, the ALJ decided to give "minimal weight" to his opinions because they were "not 'well-supported' by 'medically acceptable' diagnostic techniques, including psychological functional testing."  (Tr. 26).

Plaintiff counters that his records reveal continuing problems with irritability, frustration, anhedonia, loss of appetite, insomnia, inattention, and lack of focus.  Unfortunately, he fails to provide citations to records to support his claims, but the undersigned's reading of Dr. Roberts' notes finds that they most often describe Plaintiff's mood as stable and euthymic; Plaintiff usually denied anhedonia; and his appetite, more often than not, was good.  While insomnia was often an issue, Plaintiff also said that he did not nap during the day (Tr. 668; see also Tr. 534, 539, 571, 598, 601), there are no complaints of daytime somnolence, and this issue pre-dated his AOD (see Tr. 152).

After the ALJ's decision, Plaintiff consulted with psychologist L. Randolf Waid, Ph.D., whose aims were to "objectively assess [Plaintiff]'s intellectual/neurocognitive and psychological/emotional

---

[14] A GAF of 40 indicates that the individual has "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood[.]"  DSM-IV-TR, supra note 9, at 34.

functioning" and to complete a mental functioning questionnaire provided by Plaintiff's attorney. (Tr. 640). Plaintiff submitted Dr. Waid's report and questionnaire to the Appeals Council, which responded,

> Dr. Waid noted that your cognitive deficits may be due, at least in part, to the narcotic medications that you are taking, rather than a diagnosed mental impairment. He noted that you were always on time for your [3] appointments, you were appropriately attired with good hygiene, and you maintained eye contact. You ambulated in a relaxed manner and your affect was euthymic. Your speech was normal and you responded well to questioning. Although you complained of limited concentration and problems with memory, [testing] showed a good ability to sustain attention and concentration. Although [Dr. Waid] assessed a number of marked limitations, these appear to have been based primarily on your subjective complaints. For example, although Dr. Waid found marked limitations dealing with stress, his observations were that you cooperated with the examination procedures, there was no evidence of psychomotor retardation or excitement, and there was no evidence of anxiety or demands of testing. These observations are entirely inconsistent with Dr. Waid's opinions in this regard. Dr. Waid stated that you have had these limitations since December 2003, but provided no basis for this opinion. Furthermore, your visits to Dr. Waid occurred in June and July 2008, after the [ALJ] issued his decision and, according to Dr. Roberts, a period during which you had an exacerbation of pain complaints. For the above reasons, the Council gives these opinions little probative weight.

(Tr. 4).

"The Appeals Council must consider evidence submitted with the request for review in deciding whether to grant review 'if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'" Wilkins, 953 F.2d at 95-96 (quoting Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990); footnote omitted). Such evidence is "new" if it is neither duplicative nor cumulative, and is "material" if it is reasonably foreseeable that it would have changed the case's outcome. Id. As reasoned above, the Appeals Council declined to grant review on the basis of Dr. Waid's materials in part because his opinions were inconsistent with his findings and were based primarily on Plaintiff's subjective complaints. The Appeals Council

provided substantial evidence within its decision to support its finding of inconsistency, and that an opinion is based largely upon the claimant's self-reported symptoms may lessen its weight. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Hence, to this extent, Dr. Waid's opinions were immaterial.

The Appeals Council also noted that Plaintiff's consultations occurred after the date of the ALJ's decision. This reason is particularly important because, as pointed out by the Appeals Council, Plaintiff's condition had worsened during the time he saw Dr. Waid. Prior to his hearing, Plaintiff received authorization from his worker's compensation adjuster to see Dr. Thomas Duc, Jr., for interventional pain management. (See Tr. 110). On May 1, 2007, Dr. Duc found Plaintiff to be alert and oriented on 3 planes. (Tr. 171). His memory was intact to both long term and short term. Dr. Duc found weakness to Plaintiff's handgrip and a positive Spurling's sign on the left, but the sensory and motor exam of his lower extremities was normal. (Tr. 172). Plaintiff experienced pain to palpation from his cervical through his lower lumbar spine, but there was no decreased range of motion, neck flexion, extension or lateral rotation, or head rotation. His deep tendon reflexes were strong, and he had a normal gait and no abnormal Babinski response. Plaintiff's distraction straight leg raise testing was negative.

A week later, Plaintiff complained to Dr. Roberts of some anhedonia, but his appetite and energy were good, and he denied suicidal ideation and hopelessness. (Tr. 111). Three weeks later, Plaintiff told Dr. Roberts that he had fallen down stairs on May 18, 2007, with an accompanying worsening of his neck and back pain. (See Tr. 600). On May 31, Dr. Duc wrote that Plaintiff had "a transient exacerbation of his pain," although his physical examination was largely unchanged. (Tr. 173).

19

Plaintiff returned to Dr. Duc on July 3, 2007, reporting "13 days of excellent pain relief" from his last injections. (Tr. 196). He added that, if Dr. Duc "could take care of his cervical pain . . . this would certainly relieve most of his painful problems." (Id.). Again, Plaintiff was alert and oriented times three, with memory intact to short term and long term. His upper extremity sensory and motor exams were unchanged, and he had a normal gait. Plaintiff did, however, have pain to palpation throughout his axial spine and, on the right, a positive straight leg, and sciatic notch tenderness. Also on July 3, Dr. Roberts opined that Plaintiff was "totally disabled" from any work, although he described his physical impairment as "*[m]oderate* limitation of functional capacity; *capable of clerical/administrative (sedentary) activity.*" (Tr. 594 (emphases added)).

Just prior to the ALJ's decision, on April 1, 2008, Plaintiff's son had overdosed and been admitted to the intensive care unit. During the next week, Plaintiff was either caring for his 3-year-old grandson or at the hospital, in uncomfortable chairs and unable to take his medications. (See Tr. 549). He was also injured when his son had a seizure. By the end of the month, Plaintiff complained of worsening memory difficulties, he was "situationally anxious and depressed," and he expressed his first feelings of hopelessness. (See Tr. 548).

Between April 28, 2008, and May 7, 2008, Plaintiff experienced his first reported "panic episode" and he took 10 Vicodin at once. (See Tr. 546). His pain had increased, although not his medication usage. Plaintiff's mood was depressed and anxious, his sleep was fragmented by pain, his appetite and energy levels were low, and he had anhedonia, hopelessness, *and* suicidal ideation. This combination of symptoms was unprecedented.

Plaintiff was still doing poorly when he saw Dr. Roberts on June 6, 2008. (See Tr. 541). He was anxious and depressed, his sleep was restless, and his appetite and energy were low. He was

anhedonic and withdrawn, and he had some hopelessness and passive suicidal ideation. Plaintiff continued to experience memory difficulties. He had his first visit with Dr. Waid 5 days later, on June 11. (See Tr. 640). Dr. Roberts' observations remained unchanged at Plaintiff's June 13th visit. (See Tr. 539). Plaintiff's symptoms were the same on June 19, and his pain had increased. (Tr. 537). He saw Dr. Waid for the second time the next day, and his symptoms were ongoing at his June 27th appointment with Dr. Roberts. (See Tr. 535).

Although Plaintiff's mental symptoms improved thereafter (see Tr. 531), on July 24, 2008, he returned to Dr. Duc with complaints of low back pain (see Tr. 538). Dr. Duc found Plaintiff to be in moderate distress, with a positive straight leg raise on the left and axial low back pain. Plaintiff had his last appointment with Dr. Waid the following day. So although Plaintiff's impairments were the same, his experience of them had deteriorated. As Plaintiff's medical records clearly support the Appeals Council's reasoning, it did not err in declining review based on Dr. Waid's reports as they did not relate to the relevant period.[15]

Plaintiff adds, because Dr. Waid relied on Dr. Roberts' medical records, that this makes Dr. Waid's opinion relate to the relevant time period. This argument is flawed because there is no indication how much of Dr. Waid's opinion is due to his concurrent testing and interaction, and how much to his review of Dr. Roberts' records (which the ALJ found *not* to support Dr. Roberts' opinion). Also, that Dr. Waid opined that Plaintiff's limitations date to December 2003 does not

---

[15]Accordingly, the Appeals Council also did not err in failing to obtain an updated medical opinion from a medical expert because, for the above-cited reasons, the additional evidence could not "change the State agency medical or psychological consultant's finding that [Plaintiff]'s impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p, 61 Fed. Reg. 34,466-01, 34,467 (July 2, 1996).

make it so, and he has presented no evidence to convince either the Appeals Council or the undersigned of this statement.

### D.  Listing 12.04

Plaintiff lastly argues that the ALJ erred in finding that he did not meet 12.04 of the "Listing of Impairments," provided at 20 C.F.R. Part 404, subpart P, appendix 1 (hereinafter cited as "The Listings").  The Commissioner compares the symptoms, signs and laboratory findings of an impairment, as shown in the medical evidence, with the medical criteria for the listed impairment. "If a severe impairment is of the degree set forth in a Listing, and such impairment meets the twelve-month durational requirement, . . . then [the claimant] 'is conclusively presumed to be disabled and entitled to benefits.'" Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994) (quoting Bowen v. City of New York, 476 U.S. 467, 470-71 (1986)); see also 20 C.F.R. § 404.1520(a). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990).  It is not enough that the impairment have the diagnosis of a listed impairment; the claimant must also have the findings shown in the listing of that impairment.  20 C.F.R. § 404.1525(d); see Bowen v. Yuckert, 482 U.S. 137, 146 & n.5 (1987) (noting the claimant's burden to show that his impairment is presumptively disabling at step 3 of the sequential evaluation and to furnish medical evidence regarding his condition).

Listing 12.04 consists first of a descriptive passage, and then a set of medical findings (paragraph A criteria), one of which must be met.  See  The Listings, 12.00A.  If this criterion is met, there follows a test of functional limitations (paragraph B criteria), two of which must be met.  There is an additional functional criterion (paragraph C criteria) in Listing 12.04, which will be assessed only if the paragraph B criteria are not satisfied.  Thus, "[t]he required level of severity for [Affective

Disorders] is met when the requirements in *both A and B* are satisfied, *or* when the requirements in C are satisfied." Id., 12.04 (emphases added).

Plaintiff's argument does not address the paragraph C criteria; rather, he argues that he meets paragraphs A and B of Listing 12.04. He urges that he has experienced the paragraph A criteria of anhedonia, loss of appetite, weight loss, sleep disturbance, decreased energy, guilt and worthlessness. The ALJ did not discuss the paragraph A criterion (apparently conceding that Plaintiff met it), but addressed the paragraph B criteria and concluded that Plaintiff's mental disorders resulted in:

(1) mild restriction in activities of daily living;

(2) mild difficulties in maintaining social functioning;

(3) moderate difficulties with regard to maintaining concentration, persistence, or pace; and

(4) no episodes of decompensation.

(Tr. 21).

Plaintiff counters that he has "marked" limitations in both social functioning and activities of daily living, relying on statements by both Drs. Waid and Roberts.[16] These opinions have been discounted, as discussed above. Further, the ALJ noted (Tr. 21), that after his AOD, Plaintiff was still running his car dealership. He continued his relationships, sometimes having a friend accompany him to his counseling appointments, and going with a friend to car auctions (Tr. 397). Plaintiff became a Mason and regularly attended meetings (see Tr. 21), which he looked forward to

---

[16]Although he rated Plaintiff's GAF at 40, Dr. Roberts actually opined during the relevant period that Plaintiff had a "*moderate* range of psychological impairment" (Tr. 268 (emphasis added)), which would appear to be more consonant with the "[m]oderate symptoms" of a 60 GAF, rather than the "major impairment" of a 40 GAF (compare text at page 10, supra, with note 13, supra). Although he later opined that Plaintiff had "marked" limitations, contrary to Plaintiff's representation, Dr. Roberts did indicate that these limitations did *not* date to December 2003. (See Tr. 624-25.)

and Dr. Roberts had encouraged (see Tr. 671).  Plaintiff maintained his household,  performing chores such as weed-eating and vacuuming (see Tr. 21), and paying bills (Tr. 379, 400).  The undersigned thus finds that the ALJ provided substantial evidence to support his finding that Plaintiff did not meet Listing 12.04.

## **CONCLUSION**

Despite Plaintiff's claims, he fails to show that the Commissioner's decision was not based on substantial evidence.  This Court may not reverse a decision simply because a plaintiff has produced some evidence which might contradict the Commissioner's decision or because, if the decision was considered de novo, a different result might be reached.

This Court is charged with reviewing the case only to determine whether the findings of the Commissioner were based on substantial evidence.  Richardson v. Perales, supra.  Even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision.  Blalock v. Richardson, supra.  The Commissioner is charged with resolving conflicts in the evidence, and this Court cannot reverse that decision merely because the evidence would permit a different conclusion.  Shively v. Heckler, supra.  It is, therefore,

RECOMMENDED that the Commissioner's decision be **affirmed**.

_____
Joseph R. McCrorey
United States Magistrate Judge

November 16, 2010
Columbia, South Carolina